The second case for argument is Kristin Worth et al. v. Bob Jacobson. Ms. Kramer, when you are prepared, please proceed. Ms. Kramer, please proceed. Ms. Kramer Good morning, may it please the Court, my name is Liz Kramer, I'm Minnesota Solicitor General, I'm here with Attorney General Ellison today representing the appellant, the Commissioner. In Bruin, the Supreme Court changed the test the Courts used to evaluate gun regulations, but they did not change the test for summary judgment, and they did not change the test for mootness. And those are the two tests that are outcome determinative today. Turning to summary judgment, summary judgment should have been granted in the State's favor on the first prong of the Bruin test, the scope of the right, because plaintiffs have the burden of proof on that prong, and came forward with no evidence at all that 18-20 years old are part of the political community, they're Americans, they're people, they're  Ms. Kramer, you used the term ever there, and I remember the 26th Amendment, the fastest amendment passed in the history of the United States, scant three months. The Supreme Court has said that amendments amend everything before, several times. What role do you give to the 26th Amendment, which clearly says 18-21 years old are part of the political community, they're Americans, they're people, they're everything? Bruin makes pretty clear, Your Honor, that we cannot look at anything, say, past 1900. So if you look at Counsel, that doesn't answer my question. My question is simply, what role do you give to the 26th Amendment? None? Your answer is none. My answer is none, under the guidance of Bruin. So Bruin says to evaluate Okay, now I've got to ask you the follow-up. You know what it is. That shocks me. That the 26th Amendment had no consequence, a huge amendment passed in record time, you heard my point, but you think it doesn't affect anything before it? Not with respect to the Second Amendment. Pardon me if I intended, if I sounded like I was saying something different. No, no, no, no, no, no. But I want to give you a fair chance to dissuade me a little bit. Go ahead. What about, I'm just going to follow up, what about the Militia Act, though? I mean, clearly it applied to people who are 18 to 21 years old, and there is an actual legal requirement that those people hold guns because and we can say that that's special to the militia, but it still sort of is relevant to the first question, which is they not only had a right to hold a gun at the time of the founding because of their potential militia service, but they were required by law to have a gun and possess a gun as part of the militia. The militia laws are not sufficient, though, to counteract the overwhelming weight of history here, which shows, and we have put in an expert report on this fact, that both pre-enactment of the Second Amendment and post, all the way up through the 1800s, that people 18 to 20 were not viewed as having a constitutional right to bear arms for self-defense. So then the Militia Acts were unconstitutional then, correct? No, the Militia Acts established a duty, and a duty in a very prescribed and carefully contained environment. Just like today, we say that 15-year-olds can drive when they're with a trainer, right, but we don't say 15-year-olds can drive all the time. That's fair, but on the 18th, I mean, I get it, the militia thing, but it's not like you have to have this gun, but only in the presence of a parent, which is sort of the analogy you're drawing. No, the parents provided the guns, and then you went out and fought if you needed to as part of the militia. But in the presence of a commander, multiple superior officers who were ensuring that those young people were properly trained and using those weapons appropriately. Again, we have to put that one piece of evidence in the broader context here, and I would say both Heller and Bruin show you have to look at all of the relevant history and not look at history through a pinhole of one particular statute. And when you look at that full history, the codification of the right that happened in 1791 did not suggest that the people included 18- to 20-year-olds. The people at that point was considered adults above 21. So here, on that first prong of Bruin, where the plaintiffs bear the burden of proof, the state should have been granted summary judgment because 18- to 20-year-olds were not part of the people understood to have the Second Amendment right in any time before 1791 or even in the 1800s, which confirmed that fact. But even if this Court were to look past that and move to the second prong about the historical tradition of regulation, it would also find that that historical tradition supports the state, or at least that there's a genuine issue with fact, which means the case should go to bench trial. Before you get there, the one thing that bothers me about going on sort of step one or step zero of Bruin is if we were to hold here that minors are not part of the people, then every other reference to the people in the Constitution would presumably exclude 18- to 21-year-olds. So if you have a 19-year-old driving around, you know, the word people appears in the Fourth Amendment. So are they people for purposes of the – or not people for purposes of the Fourth Amendment? So cops could indiscriminately sort of stop people without suspicion because the Fourth Amendment doesn't apply if you're 19 and driving around in a suspicious manner? Of course not, Judge Ross. But this Court has already decided that issue in Citladin and said that the meaning of the people in the Second Amendment can differ from the meaning of the people in other amendments because those amendments serve different purposes. Some are affirmative rights and some are protective rights. And so there would be no difference here. Would it – do you think it would apply anywhere, or would this be a special for the Second Amendment only? Because, I mean, if you look through history, minority only told you so much. Some minors had certain rights at 14 or 16, like rights to marry and things like that. So is there anything – is this sort of special for the Second Amendment, or is it – could it leak into other areas of the law? You've already addressed the Fourth. As I read Bruin, it is an amendment-by-amendment analysis of what the preexisting right was that was codified and then whether the history after that confirms it. And so when we look at the Second Amendment in particular, here we have an expert who makes clear that minors were, quote, legally disabled in the eyes of the law and hence could not claim any Second Amendment right in the founding period or during the era of the Fourteenth Amendment. That's at appendix page 63. And so it doesn't need to extend to any other amendment. We're talking about the Second Amendment and its particular historical tradition. Does the State cite to any actual laws from that period that forbade those under – in the 18- to 20-year-old range from possessing firearms? I assume you're asking about that 1790 era, Chief Judge Smith? Yes. We don't have any statewide legislative enactments from that period. I absolutely can see that. We point to, you know, some city ordinances and then some college rules. But the common law is evidence in that the historical tradition test does not suggest that you only look to analogous legislative enactments. Instead, you do a fulsome view of history, including common law and historical understandings that people had at different moments in time. And you can see that even from the Bruin decision itself. What common law cases stand for the proposition that that was the common understanding of the state of the law? We have the Calcutt case from Tennessee, but also extensive writings from the leaders of constitutional thought at that time who said over and over that this was the understanding. And again, that's the function of our expert report, Chief Judge Smith, to lay that out and to ensure that we really surveyed the history of the time to establish that. And again, Bruin says that the lack of a legislative enactment cannot be dispositive because on the sensitive places issue, Bruin notes that there are no legislative enactments in the late 1700s that bar guns in sensitive places, but says nevertheless, we agree that that is a historical tradition of this country that can be regulated. On the relevance of the later point in time, you argue about Reconstruction. Bruin leaves open that later enactments can play a role. And it was a state regulation. It was the New York regulation of guns. But I wonder if Bruin sort of decides that founding era history is more important. If you read the opinion, it really focuses on founding era history and does not, it says it's relevant, but doesn't really give much weight to the Reconstruction era. Is that how you read Bruin? I know you have arguments on both, but is that how you read it? I think we have to take the words of the opinion for what they say, which is the Court did not decide which point in time is determinative. And here, obviously, it's very important that it was the 14th Amendment that made the Second Amendment applicable against the States. So that's the 1868 moment in time, which I think is the most appropriate moment. But again — By 1860 — go ahead and finish your answer. Go ahead and finish your answer. No, I stepped on you. Go ahead. No, that's okay, Judge Benton. I was just going to say — No, go ahead. I want to make clear our position is that the common understanding, the historical tradition, is the same at all of these points in time, from the 1600s up through basically 1940. I'm glad you added that because we had many of the Western states by the Construction era that said women were adults at 18. Did you know that? Most of the Western states, including Missouri, said the women became adults at 18 generally, but men not to 21. So in that respect, would women have the right to bear arms and not men, if you take the Reconstruction era? Well, if we take that era and we're looking at, you know, militia rules, those only applied to men. And here we really don't have a gender component before the Court in this case. And the test that Heller pointed to about the people, if we're talking about that first prong, Your Honor, is the political community. No, they said all Americans, counsel. I was going to say that earlier and I thought it was too obvious. But they said all Americans. And doesn't that take care of the problem about the Fourth Amendment and the First Amendment and everything else? Because you start with all Americans. That's what the Supreme Court said, as you know. So how do you answer the all Americans point? Another simple-minded question. I would like to reserve some time for rebuttal, but, Your Honor, the Heller Court said the people unambiguously means the members of the political community. So with that, I'm going to reserve my time. Thank you. Thank you, Ms. Kramer. Mr. Patterson. Good morning, Your Honors. May it please the Court, Pete Patterson, the appellees. 18- to 20-year-olds, like all other Americans, are among the people who are protected by the Second Amendment. And there is no historical tradition of regulation that would justify banning them from carrying firearms in public. Therefore, Minnesota's law is unconstitutional and the district court's decision should be affirmed. I'll start with the political community point on the plain text. Minnesota fixates on that word that Heller used to describe the people, but it used the political community as a synonym for the national community and all Americans. So it's clear that it was using political community not to mean voters, but rather to mean members of the polity, as Webster defined people to mean the body of persons who compose a nation. So it means people in terms of the polity. And to clinch the matter, Heller also said that the militia was a subset of the people. And everyone acknowledges that 18- to 20-year-olds were considered to be members of the militia at the founding, and so if that is a subset of the people, they necessarily are members of the people. But it can't be as broad as you say, and I know you take issue with this in your brief, but people who are dangerous. I think that at least some, including myself, but other judges have sort of settled on there's some evidence that they could dispossess dangerous groups in particular at the time of the founding. And those people are part of the voting public, but yet there's at least some evidence that they could be dispossessed. So aren't you a little broad in your interpretation? Yes, Your Honor. I'm not a little broad in the sense that even the dangerous people were part of the people. We're only talking about the plain text. So that's at step zero, step one, whatever you want to call it, a ruin. And then the question is, is there a tradition of regulation? And with respect to danger, there is no tradition of regulation that would allow the State to disarm individuals who are otherwise law-abiding responsible citizens on the basis of some perception that they are a member of a group that could be considered dangerous. What the Court pointed to in Jackson, for example, were laws disarming Native Americans who, of course, were not considered citizens, unfortunately, not understood to have the rights of citizens. Loyalists during the Revolutionary War who had essentially renounced their citizenship by saying we're not going to support the American cause. And then Catholics who during the Seven Years' War, this was during colonial times, they were explicitly written out of the English Declaration of Rights, which the right to arms only protected Protestants. So in Jackson, you had a case where the individual was not a law-abiding member of society. That dealt with felons. And while some may disagree with the Court's holding in that case, it does not stand for the proposition that you can disarm an otherwise law-abiding responsible citizen on the basis of being a member of some group. And that clearly can't be the right answer because, A, Bruin said we're not going to reinstitute interest balancing and we're not going to defer to what the legislatures say in this context. And it's not clear where the lines could be drawn. What about 10-year-olds? Yes. At some point, we've got to draw the line. I know you could say it's not this case, but that's not a satisfying answer. No. Absolutely, Your Honor. And so initially, the analysis, they're members of the people. And then so there's just, by common sense, there's some minimum age. So what's the minimum age? Well, the militia statutes are very pertinent evidence. Because what Heller said is the militia was understood to be the body of all individuals capable of bearing arms. And so what's the minimum age at which individuals become capable of bearing arms? Well, every single statute, every single State, including the Federal Government, tells you in the militia statutes it was 18. Not only are these individuals able to do that. Are there some 15-year-old statutes, counsel? Correct me if I'm wrong. Well, the common law was 16. So those would be the two options. 16 and 18. And what Bruin says is while the common law is important, by the founding, sometimes those common law understandings have changed. So we would say the law, the line should be drawn. Weren't there 15-year-old? I had a simple question. Weren't there 15-year-old statutes in the militia? There may have been a handful of 15. My understanding is that 16 was the common law. But then right around the enactment of the Second Amendment, it was universally considered to be 18. So those would have to be. But you'd argue a 16-year-old has the right to. No. We argue that it's 18 because that was the understanding at the founding. Maybe somebody could come to you and argue 16. We think the line should be 18. But that would be the relevant area of dispute. And in terms of the probative nature of the militia statutes, it's not only that these individuals were understood to be members of the militia. They were entrusted with firearms. And these weren't firearms that were kept, like, in a barracks or an armory somewhere. These were firearms kept in their homes. And there were absolutely zero restrictions on their ability to carry those firearms. So that shows that there is not only do these people have firearms. Oh, wait. Zero restriction when they became the militia? No. You don't mean that. Zero restriction on carrying those firearms in their day-to-day personal lives. There are zero laws. Counsel has conceded. There are zero laws at the founding restricting the ability of 18- to 20-year-olds to carry firearms. And we know that they had firearms in their personal capacity. They were required to have personal, private firearms. Well, they could be their parents, though, right? Aren't you talking too broadly? Well, they were required to provide themselves with a firearm. In a minority of states, I believe they've identified six through 1824 out of 24 states. So a quarter of the states, the parents were required to buy them for them. But they weren't their parents' firearms. They were the individuals' firearms. They were required to provide those individuals with firearms. So you have no tradition of regulation. But in any event, even if I'm wrong about this establishing the right, and you say that 18- to 20-year-olds were dependent constitutional actors, minors at the founding, what Heller says is you discern, and Bruin, is you discern the founding-era principles that limit the scope of the right. And if the founding-era principle is that minors can have their Second Amendment rights restricted, and we don't concede that. But if that's the founding-era principle, then you apply that principle today. And 18- to 20-year-olds are not minors. So it would not support them not having Second Amendment rights today. It's the same with respect to firearms. Heller said that dangerous and unusual firearms can be banned. But Bruin said, well, at the founding, maybe handguns were dangerous and unusual then, but they're not dangerous and unusual now. So a law that restricted handguns at the founding cannot support a law that restricts handguns today. And it would be the same thing here, and it's particularly pernicious, because as a minor, an 18- to 20-year-old at the founding would have another adult, an adult, a parent or guardian, who was legally responsible for their care and protection. And so what Minnesota is saying now is not only we've stripped you of this person who's responsible for your care and protection, because now you're an adult, and there's no other person who's legally obligated to do that. But not only that, we're also going to remove your right to independently defend yourself. So even if you — Counsel, I wanted to ask you. You're in the founding era, and I think the founding era actually is — favors your side a little bit more than the States. But — Yes. But when you get to the Reconstruction era, the laws have changed, and there's at least some States that restrict minors from having — 18- to 20-year-olds from having guns. And so it brings us back to the question that Justice Barrett asked in Bruin, which is, which is more relevant when you're talking about a State regulation and incorporation and all of these other things get carried in with the question? Yes. So I have two. First, I want to answer why the founding is the more relevant period, and then why, even if you're agnostic to that, it doesn't make a difference. First, with respect to the relevant period, one thing that the Supreme Court has held — and this is not an assumption, this is not an unstated thing it has with respect to the States and the Federal Government. So it's not — an option before this Court is not it's going to be 1791 for the Federal Government and 1868 for the States. Tims, the Supreme Court, said there's zero daylight between how we apply the Bill of Rights to the States and the Federal Government. And so the Second Amendment was adopted in 1791. That's the most logical date to say for the Federal Government. I don't know how you get there. There's some academic theories, but as a practical matter, I don't know how you get to say somehow that transmogrified in 1868 and changed meaning in 1868. And for another, if we were to add another State today, imagine that we add a 51st State today, and we say, okay, the Second Amendment only became applicable to that State today, because before today, they were not a State. We wouldn't say, well, the 2024 meaning of the Second Amendment applies to that State. No, we would say the 1791 meaning. The same thing, a judge sitting in 1867 deciding what does the Second Amendment mean, they would say, okay, we look to 1791 to determine what this means. And just because the Fourteenth Amendment determined whether it applied to the States, it didn't change what applied to the States. There's one Second Amendment. And that is what is incorporated against the States. With respect to whether it makes a difference here, by the adoption of the Second Amendment, the States that had enacted laws restricting the ability of minors to acquire firearms, they were all in the South. So three laws in the South is hardly what I would say we look to revolutionize our understanding. Three of 13, you're saying? No, three by 1868. Oh, 1868. So there were 40-plus States at that time. And what is more, they did not restrict the ability of individuals to carry firearms or possess firearms. They were essentially to acquire them. And they were essentially parental consent statutes. And if you look at Justice Thomas' dissent in the Brown v. Entertainment Merchants case, which the State relies on, and that was a dissenting opinion, the majority in that opinion said you can't leverage parental authority over minors to regulate them as the State, to have sovereign authority over those minors. But Justice Thomas disagreed with that, again, in dissent. But what he said, what is critical, in my opinion, in this case, which involved violent video games, he said what is critical is that it is a parental consent regime. And if the parents do buy these video games for their minors, there's nothing restricting the minors from using them. So even if you go all the way down that road with Minnesota to say these people who are not minors should be treated as minors, and there's no historical tradition for restricting them, at most it would support a parental consent regime, which is not what we have here. A parent can't say, okay, I'm going to sign off on my child's carry application and they can carry. No, it's a flat ban. So it would not even support that. Also, with respect to the 19th Century laws, there are 17 laws that restricted or 17 States that restricted the acquisition or possession of firearms by the minors. That's out of 45 States by 1900. So it's a minority regime. In Espinoza, the Supreme Court said 30 19th Century laws was not enough. So 17 clearly was not enough. And the vast majority of those, again, are acquisition. Fourteen out of the 17 are explicitly directed at minors. They're not directed at an age. They're directed at minority status. And, again, that status no longer obtains. Judge Benton, to your question, five of those States, Missouri, Illinois, Iowa, Delaware, and Kansas, had the age majority of 18 for women. So women in those States could have freely purchased firearms. So that just puts a very fine point on the matter, that it was that status to the extent there was a restriction and not age that was doing the work in those statutes, the vast majority, again, of which said nothing about age. While we're pursuing random thoughts, do you give any meaning to the 26th Amendment here? I give meaning to the 26th Amendment in the sense of if you were to interpret the people to mean the voters, which the State is saying political community in Heller means, which we dispute. But if you were going to interpret people to mean the voters, well, you would say, okay, who are the voters today? And because of the 26th Amendment, 18 to 20-year-olds are voters today. So, yes, that would have been. And since 1971. Yes. Since 1971. It's the same thing with arms. What Heller said, it was bordering on frivolous to say we're limited to the arms that were in existence at the founding. It's, no, we apply these unchanging definitions of these words, but to modern-day circumstances. So if the word people, you could, instead of people, put in voters, you wouldn't look at who. Political community. Go ahead. Political community. If that's what you interpreted political community to mean, you wouldn't look at who could vote then. You would look at who could vote today. I'd like to make a final few points, if there are any other questions. Well, I want to make sure one of those final points is mootness. Okay. Okay. Yes, yes. Because I'm very concerned about that. Okay. Because you need a pleaded throughout, and we now have a new plaintiff on appeal, which, you know, some courts have allowed substitution, but I just wonder whether the district court needs to make that call rather than having us make findings about membership and things like that. Yes. Well, it's not a new plaintiff. It's a new member. New member. New member of the organization. And we had unquestionably had standing at the outset of the litigation. There was no obligation for us to come forward because there could have been a suggestion of mootness when all our plaintiffs turned 21, and then it would be our obligation to bring forward evidence that we continue to have standing, but we preemptively did that to avoid the question. And it's well acknowledged that appellate courts can take information to assess whether a case has become moot. And particularly in a facial challenge like this one, with respect to the actual outcome of the litigation, the facts about the plaintiffs don't matter. We're challenging the statute on its face. But the only things that are relevant, that this individual is between 18 to 20-year-olds, lives in Minnesota as a member, and wants to carry a firearm, those are all set out in the declaration. There's nothing that Minnesota has indicated that would make that a questionable matter. And this is something that is done all the time. By now, it took us a while, I'll admit, with the 28J letters and such, but we've cited five cases. So Reese and Lara both just did this in the Third and the Fifth Circuit, very similar circumstances. And then the Supreme Court, in the Seattle schools case, did a similar thing in the schools context, as has the Fourth Circuit and the Ninth Circuit in the cases that we cited. Can I ask one more follow-up question, Chief? I think the State, and the State can speak for itself, but I think my understanding is they want to do discovery to see when this member was, you know, became a member, whether he's truly a member. I don't know exactly what the discovery is, but if we were to decide that here, they would be prevented from doing that discovery because we would have to decide mootness. Well, they said they wanted to do discovery on when they became a member, but that's irrelevant. As long as they were a member, which we stated, well, they were a member now, when they submitted the declaration, that's the only relevant fact. It doesn't matter if they were a member before that, because that we submitted that declaration before the last-name plaintiff turned 21. So there's no daylight at a potential time when that would become moot. Thank you, Your Honors. Thank you, Mr. Patterson. Ms. Kramer, your rebuttal. Thank you. I'd like to pick up where my opposing counsel left off with Judge Strauss, which is on mootness. Again, the organizational plaintiffs in the district court relied exclusively on the three named plaintiffs to establish their organizational standing as members. We conducted discovery. We said, what other members do you have that you're relying on that are within this age range and Minnesotans and can meet the other requirements of the statute for a permit? They said, no one else. And so it is only here, roughly two months ago, that the appellees try and establish a new member. But their case is moot. There is no previous opinion by this court saying that you can add a new member to bolster your standing once you're in the appellate court. What is missing here? Because I think the argument is, well, we've created, by the other side, we've created continuity, right? Once one person turned 21, we replaced that person with a new person. And so usually in a facial attack, you take that at face value. But you want to do discovery. What in discovery would tell you or think you should have had the opportunity to do discovery? I don't know that you think you should do it in the future, but what would you learn that would cast doubt on the viability of this person as a plaintiff? The rule that you mentioned is usually one that's brought up at a Rule 12 moment. And here we are at the Rule 56 moment, where the plaintiffs are supposed to have well in hand their organizational standing and the members that they're relying on and that they're going to rely on through the course of the litigation. It was entirely foreseeable that these individuals would turn 21 at some point, right? And so what I'm concerned about here is there's not a previous case that says you can Well, we don't have that in the Eighth Circuit, but the Fifth Circuit recently did do that, didn't they, allow supplementation? They did, Judge Smith. In the third. And so did the third. But the Fourth Circuit, in a similar circumstance in Hirschfeld, just decided their entire case was moot and vacated. And so that's what we think is appropriate based on Eighth Circuit case law. And I'll note that neither the Fifth or the Third Circuit gave any rationale for their decision. And so we just have case after case after case, right, in your view? If they can find additional plaintiffs who meet that requirement, then they should have brought a class action judgment in. They are the masters of their complaint and of their case, and it is their job to make sure that they have standing at all moments during the case. Well, I have to ask this, though, because there's a contrary point here, which is that you have a limited time from 18 to 20. And here we have a situation in which the person wasn't even 18 years old at the time the case started, I think. We tried to do the math, and I think that person was. So does that make a difference here? I don't think it does make a difference. Again, Chief, if I may continue. Yes, please. It is the plaintiff's burden to ensure that their organizations will have members who have standing throughout the litigation. Nothing in the law prevents them from having a member who is 16, 15, at the outset of the litigation, and identifying those members as someone who might be 18 to 20 at some moment during this action. And they didn't do that. And that's the burden here. We ask the Court to vacate the opinion below, either on mootness or because summary judgment should be granted to the State. Thank you very much. Thank you, Ms. Kramer. Thank you also, Mr. Patterson. The Court appreciates the quality argument that the Counsel has provided to the Court this morning and supplements it.